**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| JOHN D. KENT, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-96-N-1106-S |
| BAPTIST MEDICAL CENTER-PRINCETON, | ] |
| Defendant(s). | ] |

FILED 97 MAY 14 PM 3:36 U.S. DISTRICT COURT N.D. OF ALABAMA

**Memorandum of Opinion**

ENTERED MAY 14 1997

## I. Introduction.

In this employment discrimination action, the plaintiff, John D. Kent ("Kent"), brings claims against the defendant, Baptist Medical Center - Princeton ("BHS"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the laws of the State of Alabama. Specifically, Kent avers that BHS discriminated against him on the basis of race when it discharged him pursuant to a reduction in force and constructively discharged him. He also contends that the defendant's conduct was outrageous and amounted to an intentional infliction of emotional distress. *Complaint* at 1-3. In the pretrial order entered on April 8, 1997, the plaintiff voluntarily dismissed his breach of contract claim. *Pretrial Order* at 7. In that same order, the court dismissed with prejudice the plaintiff's claims for failure to promote, breach of contract, constructive discharge, the state law claim for outrage, and all section 1981 claims. *Id.* at 11. The only claim remaining is that for discriminatory discharge.

30

This matter is currently before the court on the defendant's motion for summary judgment, filed on March 19, 1997. The motion was briefed by both parties and, upon due consideration, will be denied.

## II. Statement of Facts.[1]

The plaintiff is a black citizen of the United States who was employed by the defendant in Birmingham, Alabama. He is a trained horticulturist with over twenty years of experience. On May 9, 1974, BHS hired Kent as a groundskeeper/gardener in the Maintenance Department under the supervision of Lester Johnson. Approximately seven years later, BHS changed his job classification to Gardener I and subsequently to Gardener II. Kent worked continuously throughout his tenure as an employee of the defendant.

At the time Kent became an employee, he signed a statement acknowledging receipt of BHS's Employee Handbook. This acknowledgment provides that BHS is an at-will employer and that both BHS and Kent were free to terminate their employment relationship at any time with or without cause. Additionally, the Handbook provides that "all employment is terminable with or without cause at the will of either the employee or the employer." *Plaintiff's Deposition* at Ex. 8.

Ben Misley served as the plaintiff's supervisor from 1980 to Misley's retirement in 1990. At that time, Carl Sanford[2], the Engineering Supervisor, became Kent's manager and

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Sanford reported to Rodney Clarke, Director of Princeton's Engineering Department, who in turn reported to Joe Harris, Vice President of Administration at the Princeton campus from 1985 until his retirement in 1995.

2

served in that capacity until November of 1993. Kent then reported to Archie Means, Building Project Manager, until the termination of Kent's employment on January 4, 1994.

In 1990, BHS employed four individuals in the Gardener II position: Robert Falls, Spencer Washington, George Sampson, and the plaintiff. Falls was white, and Washington, Sampson, and the plaintiff are black. Falls was originally hired by BHS in March 1986 in the Housekeeping Department[3] and moved to the Gardener II position sometime in 1987. Of the four men working in that capacity, the plaintiff was regarded as the team leader or lead gardener because of his expertise and leadership abilities. As lead gardener, Kent assigned each day's work to the other gardeners. The men generally worked as a group.

The Gardener II position was classified as a pay grade 13. The duties included cutting grass, keeping the grounds clean, picking up trash, and operating the incinerator. Operating the incinerator is a dirty task. Such activity involves burning hazardous waste such as "contaminated needles, body parts, [and] possible exposure to blood and other bodily fluids." *Sanford Deposition* at 31. Kent operated the incinerator for over fourteen years, up to and including the year of his termination. The parties dispute the extent to which Falls operated the incinerator, citing conflicting evidence. *Movant's Statement of Facts* at 3; *Opponent's Statement of Facts* at 2. Rodney Clarke, Director of Engineering, testified at deposition that Falls operated the incinerator "90 percent of the time" and that "[t]he other guys didn't want to do it because they didn't want to mess with that . . . infectious waste." *Clarke Deposition* at 33. Kent testified at his deposition, however, that

---

[3] The parties cite conflicting evidence as to whether Falls's duties in the housekeeping department included handling infectious waste. *Movant's Statement of Facts* at 2; *Opponent's Statement of Facts* at 2.

3

all the men in the Gardener II position alternated incinerator duties, with each man taking responsibility for one month at a time, *Plaintiff's Deposition* at 170, and that Falls did not operate the incinerator more than the other men. *Plaintiff's Declaration* at ¶ 17.

In 1991, the ADEM or the EPA established new guidelines regarding the use of incinerators, and at that time, the defendant created an Incinerator Operator position at the Princeton campus.[4] BHS did not post a job announcement for the position or request and accept applications. Falls was chosen to fill the new position effective September 1991, and his snapshot[5] reflected his change of job status.[6] BHS did not notify Carl Sanford, Falls's supervisor, that Falls had a new position until approximately one year later and did not inform the other men in the Gardener II position until November 1993. The Incinerator Operator position was classified as a pay grade 14, or one grade higher than Falls's previous position. After the position was created, however, Falls did not exclusively operate the incinerator. Rather, Kent, Washington, and Sampson performed the task as well. Falls passed away on February 15, 1996, at which time he still held the Incinerator Operator position. For some time after Falls moved to his new position, his supervisor used a Gardener II evaluation form on which to complete Falls's performance evaluations because a specific form for the Incinerator Operator position had not yet been created.[7]

---

[4] The defendant's Montclair campus had such a position.

[5] The court has adopted the defendant's use of the term "snapshot." The defendant never defined the term; however, the court assumes it regards in some manner Falls's employment record with BHS.

[6] Carl Sanford, Kent's and Falls's immediate supervisor, was not consulted regarding moving Falls into the newly created position.

[7] The parties dispute the length of time Falls's evaluations were completed on Gardener II forms.

As part of ongoing major construction projects on the Princeton campus in the late 1980's, BHS contracted with Landscape Services, Inc. ("LSI") for the installation and maintenance of newly landscaped areas on campus grounds. LSI did not operate the incinerator. Between 1990 and 1993, the areas of the Princeton grounds over which LSI had responsibility increased. In 1993, Joe Harris's recommendation that the defendant contract with LSI for all of the landscape installation and maintenance functions at the Princeton campus was approved, based upon economic considerations and the quality of LSI's work in comparison with the BHS employees working in the Gardener II capacity.[8] The decision necessitated that BHS eliminate the Gardener II position. The Incinerator Operator position, however, would be unaffected.

In November 1993, Clarke conducted a meeting of all Engineering Department employees, including the plaintiff, to discuss the department's impending reorganization.[9] Clarke distributed a chart listing all department employees. The chart indicated that Falls was an Incinerator Operator and that Sampson, Washington, and Kent were Gardener IIs. It was at this time that the plaintiff learned of Falls's earlier job reclassification. Following the meeting, Kent and his fellow Gardener IIs were temporarily assigned to Archie Means for supervision.

---

[8] In Harris's Declaration, he stated that these were two of the reasons he recommended that BHS contract with LSI. *Harris Declaration* at ¶ 3. Carl Sanford, Engineering Supervisor, however, testified at his deposition that in his opinion, LSI did not perform the tasks better than his men had. *Sanford Deposition* at 57.

[9] The parties dispute whether Joe Harris, Rodney Clarke, and John Estis met with the men in the Gardener II positions prior to this time to inform them individually that the positions were being eliminated and that BHS would find another position for each of them. The parties cite conflicting evidence to support their contentions. *Movant's Statement of Fact* at 5; *Opponent's Statement of Facts* at 3.

5

In January 1994, BHS eliminated the Gardener II position. When BHS eliminates a position, it offers the displaced employee a transfer to a comparable, vacant position. Displacing an employee, or "bumping" him or her, is forbidden. Sampson subsequently took a job in security, while Washington began to work in the laundry.

In January 1994, a secretary in the Engineering Department asked the plaintiff to attend a meeting in Environmental Services. At that meeting, Terry Campbell, the department manager, and John Estis, Director of Human Resources, discussed with Kent possible job opportunities within the department. Thereafter, Campbell and Estis met again with the plaintiff and asked him if he would like to work in that department.[10] At the second meeting, Kent explained to both men that he was concerned about job security within the Environmental Services Department as he had heard there had been a number of layoffs. He also explained that he understood that Sampson had been transferred to a position in Laundry but his salary had been reduced. Kent informed Campbell and Estis he did not want to have his salary likewise reduced but did tell them he would consider the position. Clarke told the plaintiff he wanted Kent to accept the offer, and Estis urged the

---

[10] The parties dispute whether Campbell described the duties of the available position to the plaintiff and cite conflicting evidence. Campbell stated in his declaration that he informed Kent that the job duties involved picking up trash on the campus grounds and keeping the hospital entrances clean. *Campbell Declaration* at ¶ 3. The plaintiff, however, testified at deposition that he had no such discussion with anyone regarding the position. *Plaintiff's Deposition* at 143-47. The parties also cite conflicting evidence as to whether Campbell discussed the wages Kent would receive if he accepted the offer. *See Campbell Declaration* at ¶ 3 (if Kent accepted the offer, he would not suffer a reduction in wages); *Plaintiff's Deposition* at 144 (no discussion regarding wages).

plaintiff to consider the position.[11] The plaintiff left the employ of BHS on that day, January 4, 1994.

Falls's wages were lower than Kent's in January 1994. Kent continued to be enrolled in BHS's health plan until April 24, 1994, and he received payment for earned sick leave and vacation time.

Kent testified that the only instance of race discrimination directed against him between June 9, 1993, and the day he last worked for the defendant in January 1994 was the defendant's failure to offer him the Incinerator Operator position or some other one. In January 1994, Falls had held the Incinerator Operator position since 1991 and continued to do so until his death in 1996. Kent did not request he be transferred to that position in his last two meetings with Estis and Clarke. The plaintiff contends he inquired of Clarke regarding the incinerator position, and that on the first occasion Clarke informed him he did not have time to discuss the matter, and that on the second occasion Clarke did not respond.

The plaintiff subsequently applied for Unemployment Compensation Benefits and in doing so, admitted to the investigator that BHS had offered him a position but at lower wages than his previous position.

---

[11] Clarke testified at deposition that Kent informed him during their discussion regarding the Environmental Services position that he wanted to go into the logging business with a relative and leave his employ with BHS. *Clarke Deposition* at 58, 60. Kent stated in his declaration, however, that he has no relative in the logging business and did not inform Clarke or Estis that he planned to leave BHS. *Plaintiff's Declaration* at ¶ 33. The plaintiff also stated that Clarke thereafter "ordered [him] to turn in [his] card and to clean out [his] locker." *Id.*

In the summer of 1994, one of the plaintiff's friends informed him that BHS had a possible opening in the laundry at the General Office Building. Kent then went to the General Office Building, spoke to a woman regarding the position, and applied for the job. About one month later, the woman called Kent to offer him the position. The plaintiff turned the offer down, however, stating he had already obtained employment with Benton/Marks. Kent received unemployment benefits until he began working at Benton/Marks in June 1994. In August of 1995, he left Benton/Marks for a position at HealthSouth, where he is still employed.

The plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 12, 1994, to which BHS responded on March 18, 1994. The EEOC mailed Kent a Notice of Right to Sue on December 15, 1995, and he filed this action on February 23, 1996.

### III. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The

movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's

function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

The plaintiff contends that BHS discriminated against him because of his race when it eliminated his position. A plaintiff who alleges disparate treatment based upon race under Title VII must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). The plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). This may be done in three ways: (1) "by presenting direct evidence of discriminatory intent; [(2)] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973); or [(3)] by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

### A. Direct Evidence and Statistical Evidence.

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted). A second means by which Kent may establish a prima facie case is by presenting statistical evidence that demonstrates a pattern and practice of race discrimination on the part of BHS. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (age discrimination case). The plaintiff has presented no direct evidence or statistical data regarding his Title VII claim; therefore, he

11

must attempt to establish a prima facie case of discrimination through circumstantial evidence.

### B. *McDonnell Douglas* Test.

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[12] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "'[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted.'" *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather

---

[12] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas-Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

12

is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "'[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment.'" *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The plaintiff may establish that the defendant intentionally discriminated against him "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "'Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

Kent claims that he was discharged from his employment at BHS or that his position was eliminated because he is black. In order to make out a prima facie case of racially discriminatory discharge, he must demonstrate that "(1) he belongs to a group protected by the statute; (2) he was qualified for the job from which he was suspended and not

rehired; (3) he was terminated; and (4) after his termination, the employer hired a person not in plaintiff's protected class, or retained those, having comparable or lesser qualifications, not in plaintiff's protected class." *Whiting v. Jackson State Univ.*, 616 F.2d 116, 120 (5th Cir. 1980). The defendant does not dispute that Kent has demonstrated the first two prongs of the test. *Movant's Initial Submission* at 6-8.

BHS does dispute that the plaintiff was terminated, however. *Id.* at 7-8. The defendant contends that Kent's position was eliminated when BHS contracted with LSI for landscaping services and that it "offered him a position in Environmental Services with no cut in pay or benefits" that Kent subsequently declined. *Id.* at 8. The plaintiff asserts, however, that the material facts surrounding the termination of his employment are in dispute. *Opponent's Responsive Submission* at 6. The plaintiff is correct. The parties have cited conflicting evidence regarding the events leading to the termination of Kent's employment with BHS. The defendant cites deposition testimony of Rodney Clarke and John Estis that they told Kent specific information regarding the new position's salary and duties. The plaintiff testified in deposition, however, that no one ever informed him regarding the precise nature of the Environmental Services position or the wages he would earn if he were to accept it, and that he was simply asked to turn in his card and keys. Accordingly, the court must view the facts in a light most favorable to the plaintiff and assume for purposes of the motion for summary judgment that Kent was terminated.

The defendant next asserts that Kent cannot demonstrate the fourth prong of his prima facie case -- that BHS subsequently hired a person or retained a person in the position outside the protected class. *Movant's Initial Submission* at 6-7. In 1993 when BHS

eliminated the Gardener II position, three black men occupied the jobs. Falls had been reclassified as an Incinerator Operator two years earlier; thus, no one outside the protected group was affected by BHS's decision. Kent argues, however, that after BHS terminated his employment, it retained Falls, who was white, although he was not as qualified as Kent. *Opponent's Responsive Submission* at 11-18. The evidence is contradictory as to who operated the incinerator after Falls's position was reclassified from Gardener II to Incinerator Operator. The plaintiff testified in deposition that Falls and the three men working as Gardener IIs operated the incinerator by rotating at first on a weekly basis and later on a monthly basis. *Plaintiff's Deposition* at 170. Sanford, the Gardener II's supervisor, testified that they all took turns as well. *Sanford Deposition* at 16. Clarke testified in his deposition, however, that Falls operated the incinerator "90 percent of the time." *Clarke Deposition* at 33. Again, the court must view the facts in a light most favorable to the plaintiff and thus must assume for purposes of the motion for summary judgment that Falls and Kent performed essentially the same duties although their titles differed. In order for the plaintiff to show that he performed duties similar to those of Falls, he need only establish that he shared the same type of tasks. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992). Falls is therefore a valid comparator for the plaintiff, regardless of their job titles. Kent has thus demonstrated that BHS retained a person outside the protected class and has made out a prima facie case of discriminatory discharge.

Alternatively, if the court utilizes a reduction in force analysis rather than the traditional discriminatory discharge *McDonnell Douglas* test, the result is the same. In that

15

instance, Kent would have to establish that "(1) he was a member of a protected group who was adversely affected by an employment decision; (2) he was qualified for his former position or another position at the time of the adverse decision; and (3) direct or circumstantial evidence from which a factfinder might reasonably conclude that the employer, in reaching the decision at issue, intended to discriminate on the basis of the plaintiff's [race]." *Langston v. Carraway Methodist Hosps. of Ala., Inc.*, 840 F. Supp. 854, 864 (N.D. Ala. 1993) (age discrimination case). Kent has satisfied this burden. First, he is a black man whose job was eliminated. Second, the defendant does not dispute that Kent was qualified for his position. Finally, as discussed above, the court must view the facts in a light most favorable to the plaintiff. BHS retained Falls, a white man, while eliminating the position of Kent, a black man. Such evidence is sufficient to raise an inference of intentional discrimination. Accordingly, the plaintiff has made out a prima facie case of discriminatory discharge and discriminatory reduction in force.

The burden thus shifts to the defendant to demonstrate it had a legitimate, nondiscriminatory reason for eliminating the plaintiff's position while retaining Falls. BHS asserts that its decision to contract with LSI which in turn led to the elimination of the Gardener II position was based solely on economic and "quality of workmanship" concerns. *Movant's Initial Submission* at 9. The Incinerator Operator position was unaffected by this decision, and thus, the defendant contends, BHS had no reason to eliminate that position as well. *Id.* The defendant's assertions, however, do not alter the fact that it created a new position, that of Incinerator Operator, but did not post its availability to all employees or accept any applications in an effort to fill it. Rather, BHS

16

simply chose Falls, the only white Gardener II, to assume the new position. Falls's supervisor, Sanford, was not even informed of the decision until approximately one year after it was made. Falls did not take on new duties in the process, however. In fact, his coworkers were unaware that he had assumed a new role until they were informed that their positions were being eliminated almost two years later. BHS's contentions that it based its decision to eliminate the Gardener II positions on economic and quality issues thus fail to dispute the inference that race played some role in the decision as well. Accordingly, the defendant cannot establish that it had a legitimate, nondiscriminatory reason for discharging the plaintiff, and its motion for summary judgment thus must be denied.

## V. Conclusion.

Accordingly, the motion for summary judgment will be denied. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 14th of May, 1997.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE